Home for Destitute Crippled Children and Robert F. Carr, Trustee, Appellees, v. Paul Chamberlain Boomer et al., Defendants.

Appeal of Paul Chamberlain Boomer and Laura Boomer, Appellants.

Gen. No. 41,252.

Opinion filed January 22, 1941.

HARRIS F. WILLIAMS, of Chicago, for appellants; MARTIN W. BELL, of Chicago, of counsel.

CAMERON, HEATH & BURRY, of Chicago, for appellees; WILLIAM BURRY, Jr., of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On August 27, 1924, Paul Chamberlain Boomer, as grantor, executed and delivered a sealed trust instrument, wherein he named Arthur W. Cutten, George M. Reynolds and Robert F. Carr as trustees. This instrument, in part, reads:

"I hereby transfer, assign and deliver to Arthur W. Cutten, George M. Reynolds and Robert F. Carr, all of said City of Chicago, as Trustees (hereinafter called the 'Trustees'), to be held and disposed of by

the Trustees under the trusts by this instrument created, the following:

"Certificates representing two thousand (2000) shares, each of Ten Dollars ($10) par value, of the capital stock of Texas Gulf Sulphur Company, a corporation organized under the laws of Texas, and which certificates are more particularly described as follows:

"Twenty (20) certificates numbered C13580 to 13599 (both inclusive) each for one hundred (100) shares, in favor of Jackson Bros. & Co. and endorsed in blank.

"2. The amount of the trust estate to be held by the Trustees under and subject to the terms of this instrument may be increased by me, from time to time, by my adding thereto other securities or property, a list of which shall be attached hereto and signed or initialed by the Trustees, and all such additional securities or other property so delivered to the Trustees and listed shall in all respects be subject to all the terms and conditions of this trust.

"3. The term 'securities,' or 'said securities,' wherever used in this instrument (unless otherwise indicated by the context) shall be held and construed to mean and embrace any and all of the shares of stock specifically described in paragraph 1 hereof, and also any and all other bonds, shares of stock and property of every kind and description hereafter added to, exchanged or substituted for any of said specifically described shares of stock, or in any way received or acquired hereunder by the trustees. . . .

"4. (a) The trustee shall and will, at intervals of not less than three months each, pay over to me, during my life, the net income from said securities.

"(b) Upon my death leaving me surviving my wife, Laura Boomer, the trustees shall and will pay out of said net income to said Laura Boomer during her life, or until she shall remarry, the sum of Five Thousand

Dollars ($5000) a year in installments of Twelve Hundred Fifty Dollars ($1250) each, every three months after my death. . . .

"6. If my said wife shall survive me, then upon either her death or remarriage, and if she shall not survive me then upon my death, the whole principal of said trust estate and all accumulated and undistributed net income thereof shall forthwith be distributed and paid by the trustees to the Home for Destitute Crippled Children, a corporation organized under the laws of Illinois, and now operating such a Home at 1653 Park Avenue in said City of Chicago.

"If, at the time provided for said distribution, said Home for Destitute Crippled Children shall not be in existence, or shall have abandoned the operation and maintenance of a Home for destitute crippled children, then and in such event the trustees shall then pay and distribute the whole principal of said trust estate and all accumulated and undistributed net income thereof to Chicago Home for Convalescent Women and Children, a corporation organized under the laws of Illinois, and now operating such Home at 2678 West Washington Boulevard in said City of Chicago. And if said Chicago Home for Convalescent Women and Children shall not then be in existence, or shall have abandoned the operation and maintenance of a home for convalescent women and children, then and in such event the trustees shall then pay and distribute the whole principal of said trust estate and all accumulated undistributed net income thereof to such charitable, educational, or scientific institutes or institutions then in said City of Chicago as said trustees may select. . . .

"The Trustees, and any or either thereof, and any successor trustee hereunder, shall have the right to resign at any time. In case of the death, resignation, failure, refusal or inability to act of any of the Trustees, the remaining Trustee or Trustees may, from

time to time, fill the vacancy. Any and every such resignation or appointment shall be evidenced by an instrument in writing duly signed and acknowledged (as deeds of real estate are then required by the laws of Illinois to be acknowledged) by the resigning Trustee, in case of resignation, and by the remaining Trustees making the appointment to fill any vacancy, in case of such appointment. Such instruments shall be filed for record in the Recorder's office of Cook County, Illinois. Any resigning Trustee shall, before such resignation takes effect, give at least one day's written notice to the remaining Trustees, which notice may be sent by registered mail, postage prepaid, addressed to the then last known postoffice addresses of such remaining Trustees. Any two Trustees shall have full power and may act under this instrument, and their actions as to any and every matter whatsoever shall have and be given precisely the same force and effect as though all the Trustees had joined therein.''

The trust instrument also contained a ''spendthrift clause'' for the benefit of the grantor and his wife, Laura Boomer. A notary public certified that on August 29, 1924, the grantor appeared before him in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act for the uses and purposes therein set forth. On September 8, 1924, Arthur W. Cutten, George M. Reynolds and Robert F. Carr signed, sealed and acknowledged the following:

''The undersigned, Arthur W. Cutten, George M. Reynolds and Robert F. Carr, being the Trustees designated in the above and foregoing instrument, do hereby consent to said instrument and accept the trusts therein and thereby created, and agree to perform and discharge the same in accordance with and subject to all the terms, conditions and provisions of said instrument, and we hereby acknowledge receipt from

said Paul Chamberlain Boomer of the certificates for two thousand shares of the capital stock of Texas Gulf Sulphur Company specifically described in said instrument. Witness our hands and seals at Chicago, Illinois, this 8 day of Sept. 1924." On January 25, 1938, the Home for Destitute Crippled Children, a corporation, and Robert F. Carr, a trustee, filed a complaint in equity, naming Paul Chamberlain Boomer, his wife and others as defendants, alleging, upon information and belief, that prior to June 15, 1936, the corpus of the trust (established by the instrument dated August 27, 1924) consisted of the following: 5,232 shares Texas Gulf Sulphur Company, 500 shares the Diamond Match Company, preferred, 400 shares the Diamond Match Company, common, 200 shares Chicago, Rock Island & Pacific Railway Company, 7 per cent preferred, 200 shares Illinois Central Railroad Company, common, 100 shares Southern Railway Company, preferred, and 6 shares Southern Railway Company, common; that said shares were evidenced by certificates issued in the name of Boomer and by him indorsed in blank, said certificates being located in a certain safe-deposit box in the vaults of the Harris Safe Deposit Company, and that access to said box was available to Cutten and Boomer jointly; that on or about June 15, 1936, Cutten and Boomer removed the said certificates from said box; that on June 24, 1936, Cutten died and thereupon Carr became the sole remaining trustee; that on June 25, 1936, Carr obtained admission to the box and found it empty; that the stock certificates were not found among the assets of Cutten's estate; that, on information and belief, Boomer "has said certificates in his possession today, or has control thereof. Boomer has been requested to produce said certificates and to turn them over to Carr, sole remaining trustee, but Boomer has refused to do so"; that Carr as sole remaining trustee has the sole right to the possession and custody of the cer-

tificates. The complaint prayed that the court require Boomer to deliver to Carr, as trustee, the stock certificates constituting the corpus of the trust, duly indorsed in such manner so as to enable Carr to obtain the transfer of the stock represented by the said certificates, and that Boomer account for all dividends received by him since September 8, 1924; that the court issue a preliminary injunction restraining Boomer from transferring any of the certificates, and from disposing or converting to his own use any dividends theretofore received by him, or which he should thereafter receive, and for such other and further relief as equity might require. The Boomers filed a motion to dismiss the complaint for want of equity on the ground that it did not state any equitable cause of action, that it contained no allegation that the alleged trust property therein described had ever been delivered to or was ever in the possession of the alleged trustees, that the complaint was defective in that it appeared therefrom that plaintiff had been guilty of *laches,* and that it further appeared that the plaintiffs didn't have any interest in the alleged trust property, or that the plaintiffs had any right to bring the suit. The court entered an order sustaining the motion to dismiss and granted leave to plaintiffs to file an amended complaint. On March 21, 1938, plaintiffs filed their amended and supplemental complaint, in paragraph 3 of which they alleged that the trust agreement had been signed by Boomer on August 27, 1924, and by the trustees on September 8, 1924, and that on said last mentioned date executed copies thereof were delivered by Boomer to the trustees, and an executed copy thereof delivered by the trustees to Boomer; that ''said agreement thereupon became effective and has remained and is now in full force and effect. Certificates representing 2,000 shares of the capital stock of Texas Gulf Sulphur Company, one of the defendants herein, which at that time represented

the entire corpus of said trust, were delivered by Boomer, endorsed in blank, to said Cutten, Reynolds and plaintiff Carr, as trustees. The trust described in the said agreement was thereby fully established and created and said 2,000 shares of stock of Texas Gulf Sulphur Company became the property of said Cutten, Reynolds and Carr, as trustees, and were thereafter held in their possession and under their control.'' In paragraph 4 the plaintiffs allege that for some years after the creation of the trust certificates of stock representing the corpus of the trust and being certificates for said 2,000 shares of stock of Texas Gulf Sulphur Company, or for other shares of stock representing said shares or the reinvestments of the proceeds of said shares, or some of them, were held in the physical possession of George M. Reynolds, one of the trustees, as agent for said trustees, in the vaults of the Continental Illinois National Bank and Trust Company of Chicago, or of its predecessor, and that at or about the time of the retirement and removal of Reynolds to California, said certificates were turned over to Cutten to be held in his custody as agent for the trustees, and were in fact so held by Cutten until June 15, 1936, and for some time prior were kept by Cutten, as trustee, and as agent for the other trustees, in a safe deposit box in the vaults of the Harris Safe Deposit Company in Chicago, ''access to which was available only to Cutten, one of the trustees, and Boomer, the life beneficiary, jointly.'' The amended and supplemental complaint also alleged that late in the year 1935, or early in the year 1936, Boomer called upon Carr and stated that he, Boomer, desired certain modifications in the terms of the trust agreement; that he had discussed the modifications with Cutten, who was then very ill, and that Cutten had agreed to said modifications; that Boomer stated that he wished to obtain the agreement to said modifications of Carr, as trustee, and of the Home; that Reynolds, one of the original

trustees, had theretofore executed and delivered to Cutten an instrument purported to be his resignation as trustee; that the effect of the modifications requested by Boomer was to increase the interest in the income of the trust, after the death of Boomer, of Laura Boomer, and to give an interest to Maude Boomer Cutten, the wife of Arthur W. Cutten and sister of Boomer; that thereupon Carr conferred with Cutten, who confirmed Boomer's statement to Cutten as to the latter's approval of the proposed modifications; that Carr thereupon presented the matter to the board of directors of the Home; that the board approved the proposal and by resolution authorized Carr, as vice president of the Home, and William Burry, Jr., as president, to negotiate with Boomer as to the exact terms of the modifications and to carry into effect such modifications as they might agree on with Boomer; that thereafter conferences were had between Boomer, Carr and Burry, and from time to time tentative agreements were reached on the terms of the modifications of the trust; that documents were drafted and signed, embracing the terms of the agreement; that Boomer then made further demands; that these demands were met; that Boomer nevertheless failed to turn over the stock certificates; that it then became apparent to Carr that Boomer was not acting in good faith. The complaint and amended and supplemental complaint were verified by Robert F. Carr. The answer filed by the Boomers denies all of the allegations as to delivery of the certificates. It stated that the trust instrument was drawn by Cutten's attorneys. In paragraph 5 of a reply, plaintiffs "admit that the trust instrument was drawn by Cutten's attorneys, and allege that the reason for this was that Cutten, trading in the name of Boomer, had made the money represented by the said 2000 shares of Texas Gulf Sulphur stock and that Cutten proposed to give this stock to Boomer in order to provide him with an in-

come for life, but only on condition that Boomer execute and deliver the said trust agreement and complete the creation of the trust thereunder, all of which was done as in the amended and supplemental complaint herein alleged.'' The cause was referred to a master in chancery, who recommended that the court order the defendant, Paul Chamberlain Boomer, to deliver over to plaintiff Robert F. Carr, or to plaintiff Carr and his cotrustees, the stock certificates heretofore described, duly indorsed in such manner as to enable the trustee or trustees to obtain the transfer of the shares of stock represented by such certificates, and that Boomer account for the dividends received upon the stock constituting the corpus of the trust since September 8, 1924. Objections were filed by both parties, after which the master filed a supplemental report. The objections of defendants were allowed to stand as exceptions. The chancellor overruled the exceptions and entered a decree substantially in the form recommended by the master. This appeal followed.

The theory of plaintiffs is that the ''execution and delivery of the trust instrument, in and of itself, without the delivery of the certificates as therein mentioned by the donor to the designated trustees, was sufficient to pass the title to the shares of stock to the trustees and was all that was needed to consummate the creation of the trust, and that transfer of possession of the certificates as muniments of title could be compelled later if necessary whether or not there was any consideration; and further that, even if the foregoing were not the law, and if delivery were necessary, there was delivery of the certificates at the time of delivery of the trust agreement, in that the certificates were in a brokerage account over which Cutten, one of the trustees, had control, and further that there was physical delivery of certificates for the diversified securities in 1934 and 1936; that the plaintiffs have not been guilty of *laches* as charged by Boomer, and that the

plaintiffs have the right to bring the action. It is no part of plaintiffs' theory that Cutten was the owner of the securities at the time of the creation of the trust. Cutten had made the money used for the purchase of the stock by trading in a brokerage account in the name of Boomer. He was the creator of the fund and turned it over to Boomer, his brother-in-law, with the understanding that this trust would be created. This last fact, though not essential to plaintiffs' case, is interesting for two reasons: first, it shows that Cutten had possession of the certificates at the time the trust was created, because he controlled the account in which they lay; and second, it negatives the contention of Boomer that plaintiffs are attempting to take away his property against his will.'' The theory of the Boomer defense is that the ''execution of the trust instrument, alone, was not sufficient, and that delivery of the securities was absolutely essential to the consummation of the trust, and that the securities were never delivered at any time, either in 1924 or on any later date; and also that the plaintiffs have been guilty of *laches* and that Carr, as alleged sole surviving trustee, had no right to bring the action. The further contention of the defense is that plaintiffs' 'theory' that Cutten was the owner of the securities and the real donor is not based upon any proper pleadings and is not supported by any competent evidence whatever. The defense claims further that there is no competent evidence in the record to support the decree as entered in favor of the plaintiffs.''

Before considering the propositions of law involved, it is appropriate that we summarize the facts. After a careful reading of the abstract and the exhibits, we are satisfied that the findings of fact as made by the master and the chancellor are supported by the record. For some years prior to 1924 and thereafter, Arthur W. Cutten was a well-known and successful trader in the grain and securities markets in Chicago. He was

also a director and officer of the Home for Destitute Crippled Children, an Illinois charitable corporation, which was then and now is engaged in conducting a hospital for crippled children in Chicago. Cutten's wife, Maude B. Cutten, was a sister of Boomer. In 1924 Robert F. Carr was president of the Home and was then and still is a member of its board of directors. Cutten, in addition to his own market activities, was in the habit of opening trading accounts in the names of friends and relations for the purpose of helping them out by making money for them. In about the month of August, 1924, Cutten told Carr he had made some money trading in an account for Boomer, and that he wished to have it put in trust for Boomer for life, with some provision for his wife after his death, and ultimately to go to the Home for Destitute Crippled Children. He asked Carr if he would act as cotrustee with himself and George M. Reynolds, then president of the Continental Bank of Chicago and also a director of the Home. Carr agreed to act. Shortly thereafter the trust agreement embodying these provisions was signed, sealed and delivered by Boomer as donor, and was accepted by Cutten, Reynolds and Carr, as trustees. By the terms of the trust agreement Boomer transferred to the trustees 2,000 shares of stock of the Texas Gulf Sulphur Company, the words of assignment being, "I hereby transfer, assign and deliver . . . ." The trust agreement identifies the certificates and states that they stand in the name of Jackson Brothers, the broker with whom the account was carried. The account had been opened by Cutten and he had complete control over it. There was no manual delivery of the certificates to the trustees at the time, but they were within the control of Cutten. Cutten stated to Carr and Reynolds that he would take care of the trust. It was contemplated that Carr would take no active part in its administration unless called upon to do so. Carr termed

himself a "stand-by" trustee. All the certificates remained in the hands of the broker until a year or two later, when at Cutten's direction, part of the shares were sold and the proceeds reinvested in other stocks, which now form a portion of the corpus of the trust, as listed in the decree. At about the same time, Texas Gulf Sulphur Company split its stock, and four shares were issued for each one previously held. The result was that the original 2,000 shares came to be represented by 5,232 shares of Texas Gulf Sulphur Company and the other stocks above referred to. The certificates continued to lie in the broker's hands, in street name, dividends being paid over to Boomer. In 1933 or 1934 Jackson Brothers closed their office in Chicago and requested that Boomer take delivery of the certificates, he being the nominal owner of the account, which he did with the knowledge and consent of Cutten. New certificates were issued at that time in Boomer's name. Immediately upon receipt of the certificates Boomer indorsed them in blank. About six months thereafter a joint safe-deposit box was rented at the Harris Safe Deposit Company in the name of "Paul C. Boomer Trust." The lease card was signed "Arthur W. Cutten, trustee," and "Paul C. Boomer, acting trustee" in the handwriting of Cutten and Boomer respectively. The receipt for keys, etc., was signed "Paul C. Boomer Trust by Arthur W. Cutten, trustee" (in Cutten's handwriting) and "Paul C. Boomer, acting for Geo. Reynold" (in Boomer's handwriting). On July 10, 1934, the certificates were placed in this box and remained there until March 31, 1936, when Boomer, with Cutten's secretary as Cutten's deputy, both acting under Cutten's directions, went to the box, removed the securities and handed them over to Cutten, who was then confined to his residence by what turned out to be his last illness. Meanwhile, about the end of 1935 Boomer approached Carr with the request that he agree, and that he ob-

tain the agreement of the Home, to certain modifications of the trust. This was the first time Carr had heard of the matter since 1924, except perhaps for casual references in conversations with Cutten. Boomer first requested that the trust be transferred to a trustee outside of the State of Illinois to avoid personal property tax, and later that a provision be made for the invasion of principal, if necessary, to assure $5,000 per year income to Mrs. Boomer after his death, that provision be made for participation by Mrs. Cutten, after Boomer's death, in any income above that sum (Cutten having suffered severe financial reverses) and still later that he, Boomer, be appointed cotrustee in place of Reynolds, who had sent in his resignation as trustee. Carr, after ascertaining that Cutten wished the proposed changes made, agreed to them all except the appointment of Boomer as trustee, and arranged for Boomer to submit them in person to the board of directors of the Home, which likewise approved them. When Boomer first approached Carr, Carr asked him where the certificates were and Boomer told him they were in the joint box at the Harris Trust vaults. Cutten was seriously ill, and Carr wished, before agreeing to any changes or taking any further part in the matter, to see the certificates and make sure of their safety. He also suggested this to Cutten, who, thinking he would recover, asked the inspection be postponed until he was able to take care of it himself. Cutten died on June 24, 1936. Thereafter, Carr discovered that the box at the Harris Trust had been surrendered. Carr attended when it was opened by the vault officers and it was found to be empty. Carr then asked where the certificates were. Boomer told him he had taken them to Cutten before his death and did not know what had become of them. He told a number of stories in response to inquiries by Carr at different times thereafter. Their general purport was that he did not have

the certificates and did not know where they were, but thought he could get possession of them as soon as he had been appointed a trustee of the trust. Carr finally agreed to appoint Boomer cotrustee and executed and placed in escrow an appointment to be delivered against production of the certificates. Nothing came of this. Later Boomer caused an agreement to be prepared modifying the terms of the trust and this was signed by all of the parties in interest, but by Carr and the Home only on the condition that it should not be delivered to Boomer until the certificates were made available. Because considerable time had passed, Carr made it a condition that the certificates must be produced by November 15, 1937. They were not produced by that date, and nothing further having been done, Carr and the Home filed their complaint in January, 1938. Boomer, when called for cross-examination under section 60 of the Practice Act, sought to evade questions as to the whereabouts of the certificates. Being required to give a definite answer, he stated that they were in the house of a friend in Toronto, Canada, and that he did not remember the address of the house or the name of the friend. At the next hearing on further cross-examination, he testified that the certificates were then in his possession in Chicago and that they had been there when he gave his testimony at the previous hearing and that such testimony had been false. He stated that he had possession of the certificates at all times. He admitted that in response to Carr's questions he had told Carr anything he thought would satisfy him regardless of the truth. At no time prior to the commencement of this suit did Boomer deny the existence of the trust. On the contrary, he made various statements, oral and written, admitting its existence. The first claim made by him that no trust existed appeared when he filed his motion to dismiss the complaint. The facts found by the decree are established by the testimony of Carr

and Boomer. Carr testified to various admissions made to him by Boomer. The master found that "from the demeanor of the defendant, Paul Chamberlain Boomer, on the stand and his utter disregard for the sanctity of an oath, he is not to be believed and his testimony is disregarded, except where it is corroborated by other testimony." A perusal of the transcript of the testimony convinces us that the master was entirely justified in making this finding. Boomer testified falsely as to a material matter, namely, the whereabouts of the certificates. His testimony on other matters was also unworthy of belief. The testimony of Carr rings true and is supported by the other facts and circumstances in evidence. Boomer testified that when Carr was trying to find the certificates he told him (Carr) anything he thought would satisfy Carr and stop his search for the trust property, regardless of the truth. Boomer also told an improbable story about some mysterious stranger who telephoned to him about the certificates, saying they would be delivered to Boomer when he (Boomer) had got what he wanted and been appointed cotrustee. When he was interrogated about this story, he said it was "partly true and partly not." He told Carr that while at some summer resort an unknown man had approached him and told him not to worry about the certificates, and then disappeared. Clearly, the characterization of Boomer by the master as a man "not to be believed" is supported by the record. Carr was allowed to testify over the objections of the defense to certain conversations with Cutten and with Reynolds outside of the presence of Boomer. We agree with the master and the chancellor that these conversations were admissible as part of the *res gestae*.

Turning to a consideration of the law, our attention is directed to plaintiffs' statement that their case is double-barreled; that it rests upon two general propositions—First, that the execution and delivery of the

trust agreement were effective in law immediately to create a trust, which has ever since existed, without physical delivery of any stock certificates, and Second, that if this were not the law, and assuming for the sake of argument that delivery in such a case is necessary, the evidence clearly shows that the certificates were delivered to the trustees. Defendants resist these contentions. On the subject of delivery, the defendants say that the alleged trust was never consummated for the reason that the certificates of stock, described in the instrument as constituting the corpus of the trust, were not delivered by Boomer, the donor, to the trustees designated in the instrument; that it is essential to a donation *inter vivos* that the gift be absolute and irrevocable, that the giver part with all present and future dominion over the property given, that the gift go into effect at once and not at some future time, that there be a delivery of the thing given to the donee, that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given, and that where the delivery is to a trustee for the benefit of others, the circumstances should show a full relinquishment over the property to the trustee for the purposes of the trust. Plaintiffs reply to this contention by saying that shares of stock may be transferred, in trust or otherwise, by the execution and delivery of an instrument containing present words of assignment, with intent to pass the title, without delivery of the certificates representing the shares and without consideration, and any such transfer is valid and binding as between the parties. Both parties support their points with numerous authorities. We have read these authorities. The respective opinions are, of course, written with a view to the facts involved. If we attempted to analyze and differentiate the different cases cited, this opinion would be expanded to a volume.

Boomer signed and delivered the trust instrument and he testified that he intended to create a trust when he did so. On many occasions thereafter he recognized the existence of the trust. The rights of creditors or of bona fide assignees of the certificates are not involved. The question is solely between Boomer and the trustees. We are convinced that a present unequivocal assignment of shares of stock in a corporation with intention to pass the title will accomplish the transfer of the title to the shares to the assignee as between the parties without delivery of any stock certificate. In *Leedham v. Leedham,* 218 Iowa 767, 254 N. W. 61, the court said:

"A certificate of stock is not the stock itself, but merely written evidence of the ownership thereof and the rights and liabilities resulting from such ownership. It is merely the paper representative of an incorporeal right, and stands on a footing similar to that of other muniments of title. 14 C. J. p. 478, section 698. As between the parties, real shares of stock in a corporation may be transferred by a written assignment thereof, without delivery of such certificates representing the stock." A share of stock in a corporation is an interest in the property of the corporation. It is an intangible, incorporeal property right which belongs to the stockholder, and if a person owns a share of stock he is no less entitled to the enjoyment of his rights in respect thereof, including the rights to collect dividends, to vote the share, and to transfer the share, simply because he does not have in his possession a certificate issued by the corporation evidencing his ownership. The share of stock is the property, the certificate a mere evidence or muniment of title. We are convinced that the execution and delivery of the trust instrument containing words of present assignment, with intent to pass the title, without delivery of the certificates representing the shares

and without consideration, is valid and binding as between the parties. (*Harris v. Harris,* 222 Ill. App. 164; *Allen v. Williams,* 212 Ill. App. 114.)

Defendants also assert that under the provisions of the Uniform Stock Transfer Act (par. 416, sec. 1, ch. 32, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 32.195]) title to a certificate and to the shares represented thereby can be transferred only: (a) by delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or (b) by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney itself. They also call attention to the provisions of section 10 of the same act (par. 425) which provides that ''An attempted transfer of title to a certificate or the shares represented thereby without delivery of the certificate shall have the effect of a promise to transfer and the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts.'' In the case of *In re Estate of Antkowski,* 286 Ill. App. 184, we held that the rights of the parties as between themselves are not affected by the provisions of the Uniform Stock Transfer Act, and that it was not the intention of the legislature to change the rule of law applicable as between the immediate parties to the transaction. In that opinion we quote with approval from vol. 12, sec. 5684 of Fletcher Cyclopedia Corporations, as follows: ''According to the weight of authority, a transfer of the stock to the donee on the corporate books is not essential to a valid gift as between the parties, and hence, as between them, the fact that it remains in the name of the donor on the books does not defeat the gift nor affect the title of the donee, nor has the Uniform Stock Transfer Act made any change in this rule. But there is some authority to the effect that a transfer on the books is

essential to a delivery." Our view is that the provisions of the Uniform Stock Transfer Act are not applicable to the facts in the instant case. Therefore, we are of the opinion that the signature and delivery of the trust agreement by Boomer operated immediately to create a valid trust of the stock therein specified without delivery of the stock certificates.

Our holding in the preceding paragraph that the execution and delivery of the trust instrument created a valid trust without delivery of the stock certificates, disposes of the case. However, as the defendants may petition the Supreme Court for leave to appeal, we will also state our views on the alternative proposition argued by the parties. Plaintiffs maintain that while no delivery of the certificates was necessary to the creation of the trust, nevertheless, they show that there was such delivery. Defendants, of course, maintain that there was no delivery of the securities either in 1924 or at any other time. We find that the evidence shows that (1) at the time of the execution and delivery of the trust agreement, the certificates were held in the "street name" in a brokerage account over which Cutten had control; (2) the certificates were placed in a joint safety box in 1934 to which access was available only to Cutten, as trustee, and Boomer, as agent for Reynolds, another trustee; and (3) Boomer visited the said safe-deposit box in 1936 with Cutten's deputy, removed the certificates and turned them over to Cutten. The evidence shows that during the entire period from the execution and delivery of the trust instrument until the filing of the complaint herein, Boomer was under the impression that he had created a complete, perfect and valid trust of the stock in question at the time he executed and delivered the instrument in 1924. During all of this period he never questioned the existence of the trust. In 1937, after the death of Cutten, a "modification agreement" was prepared by Boomer's attorney. This agreement was

executed by all of the parties in interest. It did not, however, go into effect because its execution by plaintiffs was conditioned upon the production of the certificates by Boomer. The preamble of this "modification agreement" recites that Boomer, by the trust agreement "did create and establish a trust in respect of certain securities constituting the trust fund thereby transferred, assigned and delivered to said Trustees," and the fifth article states that "nothing in this agreement contained or done pursuant hereto shall be deemed or construed as, or have the effect of revoking the Donor's gift in trust of the securities of the trust estate made by and under said Trust Agreement dated August 27, 1924, and said Donor hereby expressly disclaims any right, power or authority to revoke said gift, either in whole or in part, as well as any dominion or control over the trust estate created and established by said Trust Agreement." As this "modification agreement" was signed by Boomer and delivered to plaintiffs about November 1, 1937, as recently as that date he admitted and confirmed the existence and validity of the trust. In his 1936 income tax return he designated the income from these stocks as "income from fiduciaries," identifying the source as "Paul C. Boomer Trust." He contends that immediately following the delivery of the trust agreement in 1924, he read the same and that he then realized that the agreement was not entirely in accordance with his wishes; that he desired to have it changed so that on his death his wife could invade the principal, if necessary, in order for her to secure the full amount of her annuity. He maintains that he immediately informed Cutten and also the brokers who had possession of the stock; that he informed the brokers of the existence of the trust and of his insistence on making the change therein, and that thereafter he took the initiative in endeavoring to effectuate the change. It is not likely that a brokerage house

of the standing of Jackson Brothers would permit Boomer to take possession of the stocks at will after he had disclosed that they were the subject matter of a trust. Following the illness and death of Cutten, Carr became much concerned about the location of the stock certificates. He placed stop orders with the various brokers and corporations. On June 28, 1937, Boomer, seeking the release of 6 shares of Southern Railway common stock, also recognized the trust as being in existence. It is significant that Dr. Boomer appeared before a special meeting of the board of directors of the Home for Destitute Crippled Children at 3 p. m. on May 18, 1936. Carr testified that the chairman of the meeting asked Boomer to make a statement as to his desires in the matter of modifying the trust instrument. Carr stated that the matter of modifying the trust instrument was discussed around the directors' table and that the feeling was that anything the Cuttens wanted done about the matter should be granted. The minutes of the meeting recited that:

"Mr. Burry explained that the Boomer trust was formed some years ago by Mr. Arthur W. Cutten. Dr. Boomer, a brother of Mrs. Cutten, is the life beneficiary of the trust receiving the entire net income during his life and upon his death five thousand of the income is paid to his widow for life. The balance of the income is accumulated during her life and upon her death the principal and accumulated income become the property of the Home. Mr. Burry asked Dr. Boomer to state what was now desired. Dr. Boomer explained that due to changing conditions and after discussing this trust with Mr. and Mrs. A. W. Cutten, they found it necessary to ask the consideration of this board to the following suggested changes in the trust provisions.

"The trustees as now constituted under this trust, are Mr. Carr, Mr. Reynolds and Mr. Cutten. He explained that they had the resignation of Mr. Reynolds.

Due to the tax responsibilities of the trust and its beneficiaries it is suggested that a corporate trustee outside of the State of Illinois, be appointed, one primarily doing business in New York seemed the most desirable. That a further provision be added to the trust that upon the death of Dr. Boomer the first five thousand of net income be paid to his wife for her life; the second five thousand of income to be paid to Mrs. Cutten, and the balance over and above ten thousand, if any, to be divided equally between them. Upon the death of either the survivor is to receive the first five thousand of income, the balance of income to be divided equally between the said survivor and the Home.

"At this point Dr. Boomer left the meeting." After Dr. Boomer left the meeting, the minutes state that:

"There was further consideration of the subject matter. Mr. Carr carefully reviewing the circumstances surrounding the formation of this trust at the time as it was he who sat in and discussed the original arrangement with Mr. Cutten and Mr. George Reynolds.

"Mrs. Lobdell expressed the feeling that if this change in the provisions of the trust was Mr. and Mrs. Cutten's wishes, she felt that they should not hesitate to co-operate with them to this extent, any income being used ultimately for the benefit of Mrs. Cutten, as she felt that if Mrs. Cutten did not have need of this income she would without a doubt see that the Home benefited thereby. This feeling on her part is predicated upon the service and benefits which Mr. and Mrs. Cutten have extended to the Home over many years. Those present who were personally acquainted with Mr. and Mrs. Cutten agreed in Mrs. Lobdell's views.

"At the suggestion of Mr. Hayes, Mrs. Lobdell made a motion that Mr. Carr and Mr. Burry be a committee to contact Mr. Cutten to determine his wishes, and that power be extended to this committee to conclude negotiations for the adjustment of the provisions for

this trust. Seconded by Mr. Worcester. *Carried.*"
The minutes of the meeting of May 18, 1936, consti-
tute strong corroboration of the testimony of Mr. Carr.
It will be remembered that the trust instrument was
drafted by reputable attorneys employed by Mr. Cut-
ten. It was signed by Boomer in the office of these
attorneys after he had read the same. Boomer is intel-
ligent, well educated and a man of wide experience,
and we are of the opinion that at the time he signed
the trust instrument he was fully conversant with the
terms thereof. If he wanted a change made in the
instrument, the logical and natural time for him to
make the change would be at the time he was in the
attorneys' offices and before he signed and delivered
the instrument. One cannot read the record of this
case without being convinced that Cutten was the
dominant and moving personality in conceiving and
establishing the trust. We agree with the finding
of the master and the chancellor that the certificates
of stock were actually and physically delivered to the
trustees.

Defendants further maintain that the allegations of
the amended and supplemental complaint are not sup-
ported by the evidence and that the case was presented
by plaintiffs and the decree entered on a theory dif-
ferent than that set out in their pleadings. We are
satisfied that there is a substantial conformity between
the amended and supplemental complaint and the
proofs. Defendants further complain that in their
reply the plaintiffs departed from the ground taken
in their amended and supplemental complaint in that
the reply asserted Cutten was the real owner and
donor of the stock. We cannot agree with this conten-
tion. The reply states that Cutten, trading in the name
of Boomer, "had made the money represented by the
said 2000 shares of Texas Gulf Sulphur stock and that
Cutten proposed to give this stock to Boomer in order
to provide him with an income for life, but only on con-

dition that Boomer execute and deliver the said trust agreement and complete the creation of the trust thereunder, all of which was done as in the amended and supplemental complaint herein alleged.'' This allegation sets up, in effect, that Cutten was the creator of the fund. The reply does not, however, allege that Cutten was the owner of the securities at the time of the creation of the trust. We are of the opinion that there was no departure in the pleading. In discussing the facts, we stated that the admission of the testimony of Carr as to conversations with Cutten outside of the presence of Boomer was proper under the *res gestae* rule. Defendants assert that all the testimony as to conversations between Carr and Cutten or any other persons outside of the presence of defendant, is hearsay, and that it was error to admit such testimony. In considering the applicability of this rule to the factual situation before us, we should bear in mind that it is the defendants' theory that actual delivery of the certificates was necessary to perfect the trust. The testimony of Carr to which defendants object, is material in passing on this phase of the case. In Wharton on Evidence, vol. 1, p. 227, sec. 259, 3rd ed., in referring to *res gestae,* it is said:

''Their sole distinguishing feature is they (incidents and circumstances) must be the automatic and necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, . . . .''
Defendants also say that there was no occasion for the admission of *res gestae* evidence as there was nothing ambiguous about the trust instrument. We agree with plaintiffs that defendants are confusing the doctrine of *res gestae* with the parol evidence rule. It is apparent that plaintiffs are not attempting in any way to alter the terms of the trust instrument or establish that the donor therein was any person other than Boomer. There are numerous cases defining the *res gestae* rule

and its application. Prof. Wigmore, in his classic treatise on evidence, 3rd ed. vol. VI, sec. 1750, advocates leaving the application of the principle of *res gestae* absolutely to the trial court's determination. The question of admissibility depends upon the facts of the case and the trial court should be clothed with a reasonable degree of latitude. We are also of the opinion that Cutten's statements are admissible to establish the reasonableness of Carr's inactivity during the period from 1924 to 1936.

An additional point advanced by defendants is that the plaintiffs are guilty of laches, and that the claims of plaintiffs are stale beyond repair. They say that many changes took place since September 8, 1924, when the trust instrument was signed, and January 25, 1938, when this action was begun, and that many of the books of Jackson Brothers had been lost or destroyed, all of the members of the firm of Jackson Brothers, except one, had died, Reynolds had retired and moved to California, Cutten had died in June, 1936, Boomer had retained the stocks and collected dividends thereon without any objection during all of these years, Carr taking no action of any consequence until the first part of 1936, and assert that this sort of conduct on the part of the alleged trustees does not afford a satisfactory background in an action in equity. In our opinion, there is no merit to defendants' contention that the action is barred by laches. We have heretofore pointed out that Cutten was the dominating personality in the establishment and operation of the trust. The evidence shows that Carr was a "standby" trustee. He did not become active until he learned that Cutten was seriously ill. He then did everything that a man in such circumstances would do. There has been no change in the position of Boomer which would render it inequitable to enforce the claim against him. Boomer, at all times until the filing of the action, recognized the existence of the trust. Carr acted with all

due diligence. It must be borne in mind also that the ultimate purpose of the trust was to provide hospital and medical care for destitute crippled children. They are the real ultimate beneficiaries of the trust. We doubt that any inactivity on the part of a trustee could defeat the trust in so far as the ultimate beneficiaries are concerned. Although the Home, the donor and the trustees signed a modification agreement, we seriously doubt that in the absence of a reserved power such proposed modification could, in law, alter the terms of the trust. This was a charitable trust, and the ultimate beneficiaries, namely destitute crippled children, have rights which should be protected by a court of chancery. Another proposition argued by the defendants is that Carr, under the law and the terms of the trust instrument, had no right and no power to bring the action, as alleged sole surviving trustee. One of the prayers of the complaint is that the court appoint two trustees whose names are therein suggested by plaintiffs. The language of the trust instrument is that ''in case of the death, resignation, failure, refusal or inability to act of any trustee, the remaining trustee or trustees may, from time to time, fill the vacancy.'' Section 195 of the restatement of the law of trusts declares that ''if two or more persons are named as trustees and one or more of them fails to become trustee or dies, resigns, is removed or otherwise ceases to be trustee, the powers conferred upon the trustees can properly be exercised by the remaining trustee or trustees, unless it is otherwise provided by the terms of the trust.'' The case of *Golder v. Bressler,* 105 Ill. 419, is authority for the statement that it is only when the terms of the power creating the trust imperatively require the vacancy to be filled, that the acts of the survivors will be held invalid. It will be observed that there are two plaintiffs. Defendants do not make any contention that the Home for Destitute Crippled Children, one of the plaintiffs, is not a proper party to

prosecute the action. The contention that the plaintiffs are not proper parties to prosecute the action is without merit.

Finally, defendants argue that it was improper for the court to reserve jurisdiction for the purpose of entering a subsequent decree fixing the master's fees and taxing costs and for the purpose of entering a further decree touching and allowing the payment of plaintiffs' costs and expenses and solicitors' fees and other fees. While it is the better practice to dispose of all matters in the decree, including the determination and taxing of costs and fees, it is not uncommon to reserve such questions for future determination. The decision as to whether to reserve such matters for future determination rests largely within the discretion of the court. The record before us does not show that in reserving these matters the chancellor abused his discretion.

Because of the views expressed, the decree of the superior court of Cook county should be and it is affirmed.

*Decree affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.