WILLIAM A. GOLDER *et al.*

*v.*

PETER BRESSLER.

*Filed at Ottawa January 31, 1883.*

1. EVIDENCE—*as to proof of acceptance by State Bank of act of 1847, to close up its affairs.* Section 3 of the act of 1847, for closing the affairs of the State Bank of Illinois, required the bank to signify its acceptance of the provisions thereof within three days from its passage, by a writing signed by the president and cashier, under the seal of the bank. To prove such acceptance a copy of an order to that effect of the board of directors, taken from the minutes of their proceedings, duly certified by the president and cashier, under the seal of the bank, was given in evidence, over an objection: *Held*, that while it might have been more formal to have simply certified the fact of acceptance, without showing the acceptance itself, as was done, yet the course adopted was a substantial compliance with the act.

2. SAME—*official appointment—how shown.* The certificate of the Secretary of State that it appears, from the records of his office, that the Governor on a certain day appointed A, B and C trustees, to take charge of the assets of the State Bank, as provided by law, is clearly inadmissible to prove the fact of such appointment. The Secretary of State should have certified to a transcript of the record showing the appointment.

3. SAME—*presumption and burden of proof as to appointment to office.* Where it is made to appear in a collateral proceeding that one is acting in some public or *quasi* public capacity or employment, under color of an appointment, it will be presumed, in the absence of any proof to the contrary, that his appointment is legal and valid. This presumption has the effect of shifting the burthen of proof upon those who seek to assail his title.

This doctrine clearly applies to the trustees of the State Bank, to sustain their acts done in pursuance of law.

4. SAME—*secondary, of lost unrecorded deed.* Where the existence of an original deed is clearly shown by one witness, and its loss is shown by two witnesses, who prove that diligent search has been made for it among the papers and files of a bank, where they had every reason to suppose it would be found, and where it naturally would be left, and that they were unable to find or produce it, this will be sufficient to admit secondary evidence of its contents.

5. SAME—*sufficiency of proof of contents of lost deed.* To prove the contents of a lost deed made by the State Bank of Illinois to the assignees thereof, one of the grantees testified that in a minute-book of the bank, under a given date, would be found, in his handwriting, a copy of such deed, and that it was a true copy, which he made from the original conveyance, and it was stipulated that an exhibit was a true and correct copy of the deed so spread upon the minute-book, so far as the body of the deed was concerned. It appeared that the witness, in making the transcript of the original deed upon the minute-book, omitted the name of the president, and also failed to make any scrawl or other impression to indicate the seal, both of which, however, the evidence showed were on the original: *Held,* that the mere execution of the deed was sufficiently proved, without reference to the copy, and that the exhibit, with the stipulation, proved the contents of the deed.

6. OFFICERS DE FACTO—*assignees of the State Bank—questioning their authority in a collateral proceeding.* In the strict technical sense of the word, an assignee or trustee of the State Bank, appointed by the Governor under the act of 1847, is not an officer, nor is he such within the meaning of the statute relating to informations in the nature of a *quo warranto,* but he is to be regarded as an officer, so far as the rights of the public and third persons are affected by his acts, in so far that in a collateral proceeding it is sufficient to show him to be an officer *de facto,* in protection of those rights. The rule as to officers *de facto* applies equally to persons acting in a public or *quasi* public fiduciary capacity.

7. The appointment of an administrator or conservator of an insane person can not be questioned in a mere collateral proceeding, and the same rule applies to the assignees of the State Bank. In all such cases, so far as the rights of third persons are concerned, it is sufficient to show, in a collateral proceeding, that one claiming to sustain such relation under color of appointment is acting as such, or did act as such.

8. TRUSTS AND TRUSTEES—*assignees of the State Bank—of the public character of their trust—former decision.* The State of Illinois being a large subscriber to the capital stock of the old State Bank, and interested in the winding up of its affairs, the office and duties of the trustees appointed for that purpose were of a public nature, and not private. Expressions to the contrary in the case of *The People ex rel. v. Ridgely et al.* 21 Ill. 65, are to be regarded as made *in arguendo* merely.

9. SAME—*manner of filling vacancy.* The general rule is, that the author of a trust has the right to say in what manner a vacancy in the office of a trustee shall be filled, and where this has been done through the deed creating the trust, the vacancy can not be filled in any other way, unless there is a failure on the part of the remaining trustees to perform this duty, in which case a court of chancery will interpose.

10. SAME—*filling vacancies in the trusteeship of the State Bank.* But where assignees of the State Bank of Illinois were appointed by the Governor under the provisions of a statute, which required all vacancies to be filled by the remaining assignees, and the bank, by deed of assignment, conveyed all its property and assets to such assignees, in which it was provided that vacancies should be filled by a court of chancery, such assignment having been made in pursuance of the requirements of the same statute, it was *held,* that a vacancy was properly filled by the remaining assignees.

11. SAME—*the statute construed as to filling vacancies in board of assignees.* The act of 1847, (section 2,) relating to the State Bank of Illinois, and providing for the appointment of assignees to close its affairs, provided that they should be governed in doing so by the provisions of the act of 1845, so far as its provisions were applicable. Section 13 of the last named act required the remaining assignees to fill all vacancies, etc.: *Held,* that section 13 of the act of 1845 must control the filling of vacancies in the board of trustees, under the act of 1847, to the same extent as if it had in terms been embodied in the latter act.

12. SAME—*divestiture of title—and vesting title in new trustee.* The general rule is, that the mere appointment of a new trustee in the place of one who has resigned, does not, *per se,* divest the latter of his legal interest in the trust estate, nor does it confer any title thereto on his successor.

13. But where a trustee is appointed under an act of the legislature, which expressly declares that upon the appointment of a new trustee to fill a vacancy, the title to the trust shall vest in him in the same manner and to the same extent that it did in the original trustee whose vacancy he is appointed to fill, no conveyance is required to clothe such new trustee with the title to the trust estate, but in such case he will become invested with the title by operation of law.

14. SAME—*death of one of several trustees—the survivor holds the estate.* By the common law, as well as by statute, the estate of trustees is held in joint tenancy, and hence upon the death of one of several trustees nothing passes to his heir or personal representatives, but the whole estate devolves upon the survivors.

15. SAME—*conveyance by part of trustees only—when good.* The title to trust property can only be conveyed by the act of all the trustees having an interest in it. Such interest is an entirety, and can only pass as a whole; hence all the trustees living having an interest in the property must join in the conveyance, otherwise it will be wholly inoperative. But where one of

the trustees dies, a deed by the survivors, representing the entire title, will be good, even though they are authorized to fill the vacancy. It is only where the terms of the power creating the trust imperatively require the vacancy to be filled, that the acts of the survivors will be held invalid.

16. SAME—*decree, whether releases from trust.* A decree of the United States Circuit Court against the assignees of the State Bank of Illinois, directing them to pay over to the master in chancery all the assets of the bank then in their hands, except certain amounts, the object of the bill in such case not being to remove the assignees, but only to reach the assets in their hands, will not be held to relieve such assignees of their trust, or prevent them from selling and conveying real estate of the bank afterwards, where such land was not involved in the suit, and no order of court was made in reference to it.

WRIT OF ERROR to the Circuit Court of Whiteside county; the Hon. WILLIAM BROWN, Judge, presiding.

Messrs. MANAHAN & WARD, for the plaintiffs in error

Messrs. C. J. & C. C. JOHNSON, for the defendant in error.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

Peter Bressler, the defendant in error, claiming to be owner in fee of the one undivided third part of block 43, in the town of Sterling, Whiteside county, brought his bill in the circuit court of that county for the partition thereof, making William A. Golder and Moses Dillon defendants. Mary Wallace, claiming to be the owner of the property, appeared, and filed a cross-petition, in which she set up title to the whole of the premises. Answers were filed by Golder and Dillon, denying the averments of the original bill, and by Bressler, denying the allegations of the cross-petition of Mary Wallace. Replications were filed to the answers, and the cause was heard upon the pleadings and proofs, resulting in a decree finding that Bressler was the owner in fee, as tenant in common with the other claimants, of one undivided third part of so much of said block 43 as lies in section 21, being about one half of the block, and that he had no interest in the remaining portion of said block, which lies in section 28.

Plaintiffs in error not being satisfied with this decree, bring the case here for review.

As the controversy in the case is confined exclusively to the competency and sufficiency of the testimony offered by Bressler in support of his title, it will be unnecessary to consider the propriety of the decree so far as it relates to the interests of the other parties.

It is conceded that Nelson Mason was the patentee of the whole of the land in controversy, and that he conveyed to Thomas Mather an undivided third part of the block in question, who subsequently sold and conveyed the same to the State Bank of Illinois, through which Bressler, by *mesne* conveyances, claims title. At the hearing, Bressler, for the purpose of deducing title from the bank to himself, offered in evidence, first, an act of the legislature entitled "An act supplemental to an act to reduce the public debt one million of dollars, and to put the Bank of Illinois into liquidation," approved February 28, 1845; and second, the act of 1847, entitled "An act for finally closing the affairs of the State Bank of Illinois," approved March 1, 1847.

By the 3d section of the act first above mentioned, the bank, if it accepted its provisions, was required, within thirty days from the date of such acceptance, to make an assignment of all its effects, both real and personal, to certain specified trustees, to be by them administered and accounted for under the provisions of the act. By the 10th section the assignees were authorized to make conveyances of lands acquired or held by them as such assignees. The 13th section provides, that should any person named in the act as assignee die, resign or refuse to act, the vacancy might be filled by the remaining assignees, and that upon such appointment all rights and titles conferred by the act should vest in the assignee so appointed.

By the 1st and 2d sections of the act of 1847, above mentioned, the charter of the bank was extended to the 1st of

November, 1848, and it was provided that if its affairs should not be closed before that time, "the Governor should appoint three trustees, whose duty it should be to take charge of all the effects of said bank, and wind up its affairs, *they to be governed in so doing by the provisions of the act*" of the 28th of February, 1845, above mentioned. The 3d section made it the duty of the bank, within three days of the passage of the act, to signify its acceptance of the provisions thereof by a writing, signed by the president and cashier, under the seal of the bank.

The defendant in error, for the purpose of showing a compliance on the part of the bank with the several provisions of the above acts of the legislature, offered in evidence, in the third place, a copy of an order of the board of directors taken from the minutes of their proceedings, and duly certified by the president and cashier, under the seal of the bank, showing an acceptance of the provisions of the act of 1847 within the time prescribed by the 3d section of that act. It is objected by plaintiffs in error that the instrument offered is not sufficient as an execution of such authority,—that it is a mere "certificate of the authority itself." This objection, as we understand it, is highly technical, and we perceive but little force in it. It would possibly have been a more formal compliance with the literal language of the act to have simply certified the fact of acceptance, without showing the acceptance itself, as was done. We regard the course adopted as a substantial compliance with the requirements of the act, and hence there was no error in admitting the certificate in evidence.

For the purpose of showing the appointment of trustees by the Governor, as provided by the 2d section of the act of 1847, the defendant in error then offered in evidence a certificate of the Secretary of State, setting forth merely that it appeared, from the records of his office, the Governor, on the 1st day of November, 1848, appointed N. Ridgely, Uri Manly,

and John Calhoun, Esqs., trustees, to take charge of the assets of the bank, as provided by law, without certifying, as should have been done, a transcript of the record itself showing such appointment. The court admitted the certificate in evidence, against the objections of the plaintiffs in error, and this is one of the grounds upon which a reversal is asked. We are aware of no statute authorizing the admission of such a certificate in evidence, and it is clear that by the general principles governing the production of testimony it was not admissible. (1 Greenleaf's Evidence, 501; *Freeland* v. *Board of Supervisors of Jasper County,* 27 Ill. 303.) It follows, therefore, that if the evidence, exclusive of the certificate, is not sufficient to sustain the decree, it should be reversed for this error.

If this were a direct proceeding attacking the legality of the appointment of these trustees, and the evidence tended to show the provisions of the statute authorizing such appointment had not been complied with, then it is clear enough the trustees, or those claiming under them, would be bound to show a substantial compliance with the act. But that is not the case here. When this case was first before us for consideration, it was said, in substance, that so far as the public or those dealing with the trustees were concerned, it was not necessary to show they were officers *de jure,* but that it was sufficient to show they were acting as such,—or, in other words, that they were officers *de facto.* To this it is now replied that they were not officers at all, and in support of this position they cite *People ex rel. Kœrner et al.* v. *Ridgely et al.* 21 Ill. 65. The language used in that case must, of course, be construed in reference to the facts and circumstances then before the court, and the object and purpose of the proceeding the court was then reviewing. That was a proceeding by the People, in the nature of a *quo warranto,* against these same trustees, for the purpose of ousting them from their alleged *office* of trustees. It appears the Governor

had made an order removing them as trustees of the bank, and appointing others in their stead, and that upon their refusal to acquiesce in the action of the Governor, an information was filed against them for the purpose above stated. The question upon which the case turned was, whether the position of the trustees of the bank, or the privileges conferred upon them by the act of the legislature, constituted an office or franchise, within the meaning of the statute relating to informations in the nature of a *quo warranto,* and it was held, as we think properly, they did not.

But it does not necessarily follow that the well recognized rule, that so far as the rights of the public or third parties are concerned it is sufficient to show, in a collateral proceeding, that one has acted in a public office, or, in other words, is an officer *de facto,* is not equally applicable to persons acting in a public or *quasi* public fiduciary capacity, such as the trustees in this case. The doctrine is well settled, at least so far as this court is concerned, that the appointment of an administrator can not be questioned in a mere collateral proceeding. (*Wight* v. *Wallbaum,* 39 Ill. 563 ; *Duffin* v. *Abbott,* 48 id. 18.) And so it is held that the legality of the appointment of a conservator of an insane person can not be collaterally inquired into. (*Dodge, Conservator* v. *Cole et al.* 97 Ill. 338.) It is sufficient in all such cases, so far as the rights of third parties are concerned, to show, in a mere collateral proceeding, that one claiming to sustain such relation under color of appointment is acting as such. And yet there is no more propriety in calling the conservator of an insane person, an administrator or guardian, an officer, or his position an office, than there is in calling one of these trustees an officer. In an extended sense of the term it is not at all improper, in speaking of the position and functions of an executor, administrator or other trustee, to characterize them as the office of the one sustaining such a relation. Thus, nothing is more common in the text books and reports, than

to speak of the office of an executor, trustee, etc.; but there
is a marked legal distinction, for many purposes, between a
mere trustee and an officer, in the strict technical sense of
that term, but so far as the rule of evidence under considera-
tion is concerned, it applies equally to both classes of persons.
In using the expressions "officer *de facto*," and "officer *de
jure*," as was done on a former occasion in connection with
this case, we did not intend to be understood as thereby
holding that these trustees are officers, within the meaning
of the statute relating to informations in the nature of a
*quo warranto*, for to so hold would be in direct conflict with
the case of *The People ex rel.* v. *Ridgely et al., supra,* which,
as already stated, we regard as properly decided.

It is in effect replied to the view here taken, that the office
and duties of these trustees are not of a public or *quasi* public
character; that the interests which they represent and the
duties required of them are of a strictly private nature, and
that the public is in no sense affected by or concerned with
them. Although expressions are to be found in the opinion
in *The People ex rel.* v. *Ridgely et al. supra,* which seem to
warrant this position, yet it is manifestly untenable. These
trustees are not of a strictly private character, as is the case
where one private person appoints others to take charge of
his effects, and administer them for the benefit of his cred-
itors, or for other legitimate purposes. The State Bank of
Illinois was chartered by a public act, in 1835, and by an
amendatory act, in 1837, the Governor was authorized and
required to subscribe for and on behalf of the State, $100,000
of the capital stock of the bank, which had been reserved
under the original act for that purpose, and under the amend-
atory act of 1847, as we have already seen, it was made the
duty of the Governor, upon the acceptance of the provisions
of the latter act by the bank, to appoint three trustees, for the
purpose of winding up its affairs. And the evidence shows
the provisions of this act were formally accepted by the bank,

and that shortly thereafter N. Ridgely, Uri Manly, and John Calhoun, claiming to have been so appointed by the Governor, assumed to act and discharge the duties imposed by law upon them as trustees.    It will be thus seen that the whole people of the State, by reason of the State having become a sub-scriber to its capital stock, were, at least for a while, directly interested in the bank's management, and that the appoint-ment of the trustees, their powers and duties, were expressly provided for and regulated by statutory provisions, and in this respect they were clearly as public as any other agents acting under statutory powers.    The expressions in the opin-ion above referred to not in harmony with what is here said, were not at. all essential to the decision in that case, and were made *in arguendo* merely, and should not, therefore, have a controlling. influence upon the question as now pre-sented.

But suppose we admit the right of plaintiffs in error to question in this proceeding the regularity or legality of the appointment of these trustees, (and we concede there are authorities which sanction such a course,) still it does not follow that the failure of defendant in error to show they were legally appointed, is fatal to his title.    That depends entirely upon whom, under the circumstances, the burden of proof rested.    It is believed to be a well recognized rule that where it appears, in a proceeding like this, one is acting in some public or *quasi* public employment under color of an official appointment, it will be presumed, in the absence of any proof to the contrary, his appointment is legal and valid.    This presumption, therefore, has the effect of shifting the burthen of proof upon those who seek to assail his title.    2 Best on Evidence, secs. 355, 356.

In speaking of official appointments, this author says: "It is a general principle that persons acting in a public capacity is *prima facie* evidence of their having been duly authorized so to do, and even though the office be one the appointment

to which must have been in writing, it is not, at least in the first instance, necessary to produce the document, or account for its non-production." Again, in section 357, the same author says: "This presumption is not restricted to appointments of a strictly public nature. It has been held to apply to constables and watchmen appointed by commissioners under a local act, and to trustees empowered by act of parliament to raise money to build a church." The same doctrine is laid down by Wharton in his work on Evidence, sec. 1315.

That the principle under consideration is clearly applicable to these trustees we have not the slightest doubt, and that such is the case is fully shown by the authorities referred to by the authors above cited. It follows, therefore, the failure of defendant in error to show a valid appointment by the Governor is a matter of no consequence, as, under the facts before us, it will be presumed they were legally appointed.

It is also contended that the original conveyance from the bank to the trustees is not satisfactorily established; that in the first place, a sufficient foundation was not laid for the introduction of secondary evidence of its contents; that in the next place, the secondary evidence, when admitted, was insufficient to prove such a conveyance. We do not think either of these positions is well taken. The testimony of Ridgely clearly shows the existence of the original deed, and his and Campbell's testimony proves its loss, and also that diligent search was made by them for it among the papers and files of the bank,—the only place where they had any reason to suppose it would be found,—and that they were unable to find or produce it. This, we think, was sufficient. The evidence offered to establish the contents of the deed we also regard as equally sufficient. Ridgely, in the course of his testimony, says: "In a book of the minutes of the proceedings of the directors of the State Bank of Illinois, under date of October 31, 1848, will be found, in my handwriting, a copy of such deed, and that it is a true copy, which

copy I made from the original conveyance." It was stipu-
lated on the trial, that "Exhibit B" was "a true and correct
copy of the deed spread. upon the minute-books of the bank,
*so far as the body of the deed was concerned.".* Under this
stipulation "Exhibit B," which also contained the name of
the president, and a representation of the seal of the bank,
was admitted in evidence. It appears that Ridgely, in making
a transcript of the original deed upon the minute-books of
the bank, omitted the name of the president, and also failed
to make any scroll or other impression to indicate the seal,
both of which, as the evidence shows, were on the original;
and it is now said by plaintiffs in error, in effect, that "Ex-
hibit B" is the only evidence offered for the purpose of show-
ing the contents of the deed, and if that is to be accepted as
a true copy of the original as it appears on the records of the
bank, it fails to show an execution of the deed by the presi-
dent of the bank, or any one else authorized to bind it,—or,
in other words, it affirmatively shows the original to have
been a mere blank. The argument is specious in this, that
it overlooks the fact which appears from the testimony of
Ridgely, independently of the copy in question, that the bank
made to him and the other trustees a deed of assignment of
its property; that he believed the seal of the bank was affixed
to the same, and that while he could not swear positively
unless he could see it, he had no doubt of the fact. The
making of the deed was, therefore, sufficiently shown, so far
as the mere execution of it is concerned, without reference to
the copy as it appeared on the records of the bank. It is
but fair to say, in the light of the stipulation, that both par-
ties understood, at the time, the copy was put in evidence for
the sole purpose of showing the contents of the body of the
deed. So far as the formal execution of the deed was con-
cerned, there was but one proper way of doing that, hence
in transcribing it the seal and signature of the president
were omitted.

The evidence further shows, that on the 31st of March, 1859, Calhoun resigned his position as trustee, and James Campbell was appointed by Manly and Ridgely, the remaining trustees, in his stead. Some objections are made as to the sufficiency as well as the relevancy of the evidence showing these facts; but we perceive no force in them, and they therefore require no discussion at our hands.

. It is also objected that the original deed of assignment by the bank to these trustees expressly provides that in the event of the death, resignation or removal of any one of the trustees, the vacancy thus occasioned should be filled by a court of chancery, and hence it is concluded that there was no power in the remaining trustees to make the appointment of Campbell. If the bank in making this assignment, and the trustees in executing its provisions, had not been acting under special statutory provisions requiring vacancies of the kind to be filled in the manner adopted, the objection would clearly be well taken, for the general rule unquestionably is, that the author of a trust has the right to say in what manner vacancies of this kind shall be filled, and when this has been done through the deed creating the trust, such vacancies can not be filled in any other way, unless there is a failure on the part of the trustees to perform this duty, in which case chancery will interpose; but the 2d section of the act of 1847, under which these trustees were appointed, provides that "the Governor shall appoint three trustees, whose duty it shall be to take charge of all the assets of the bank, and wind up its affairs, *they being governed in doing so* by the provisions of" the act of 1845, above referred to, so far as said provisions are applicable. The 13th section of the latter act declares, that "should any of the persons named in this act die, resign or refuse to act, the vacancies may be filled by the remaining assignees, and on their failure or refusal so to do, the Governor shall fill such vacancy." It will not be pretended that the provision of the act of 1845 with reference

to filling of vacancies is not just as appropriate to one set of trustees as the other, and hence it can not be said with propriety the provision in question is not applicable to the trustees under the act of 1847. We are therefore of opinion it was the intention of the legislature that the provision in question should regulate and control the filling of vacancies in the board of trustees under the act of 1847, to the same extent as if it had in terms been embodied in the latter act. Such was the view taken of this question in the *Ridgely case, supra*. It was there said: "The act of 1847, under which the defendants were appointed, refers to the act of 1845, specially applicable to the Bank of Illinois, at Shawneetown, which act is to govern in winding up the bank, as far as applicable. By the 13th section of that act, on a vacancy occurring in the board of assignees, it was to be filled by the remaining assignees; if they fail to fill it, then the Governor is to fill it."

It is further objected, that conceding this to be the proper view of the matter, and that the vacancy occasioned by the resignation of Calhoun was properly filled by the appointment of Campbell in the manner we have seen, nevertheless it was necessary that Calhoun, the retiring trustee, should have reconveyed his interest in the trust estate in such manner as to vest the same in Campbell, his successor; that the mere resignation on his part, and the appointment of his successor, did not, *ipso facto*, transfer to the latter such interest; and that defendant in error, not having traced his title through Calhoun, has failed to make it out. It is conceded the general rule is, that the mere appointment of a new trustee in the place of one who has resigned, does not, *per se*, divest the latter of his legal interest in the trust estate, nor does it confer any title thereto on his successor. But there is one well recognized exception to this rule, and the present case, we are of opinion, is brought directly within it. Where such an appointment is made under an act of the legislature, as

was done in this case, which expressly declares that upon the appointment of a new trustee to fill a vacancy, the title to the trust estate shall vest in him in the same manner and to the same extent that it did in the original trustee whose vacancy he is appointed to fill, no conveyance will be required to clothe such new trustee with the title to the trust estate, but in such case he will become vested with the title by operation of law. (1 Perry on Trusts, 284.) The 13th section of the act of 1845, under which the present appointment was made, contains, in effect, just such a provision, and hence we hold that upon the appointment and qualification of Campbell, he, by operation of law, became seized and possessed of the same interest and estate in the trust property which were theretofore owned and held by Calhoun, and that the latter thereupon, by the same means, became divested of all title and interest in or to the same.

It further appears that Manly died in 1864, and that Campbell and Ridgely, without having filled the vacancy occasioned by Manly's death, on the 18th of May, 1868, conveyed the property in controversy to Joseph Miller and Fred H. Kent, the grantors of defendant in error, and plaintiffs in error now claim that no interest or title passed by that deed, and to sustain this position they invoke the familiar doctrine that where several trustees are appointed by name, and all qualify, and take upon themselves the execution of the trust, they must act as a body, otherwise their acts will be inoperative,—that as the power creating them requires them to so act, a conveyance made by one, or any number less than all, is unauthorized, and consequently no title passes. We do not question this doctrine at all—on the contrary, we admit it to the fullest extent. But we do not think it has any application to the facts of this case. The question here presented is, are the acts of the surviving trustees, who, having a power to fill vacancies, have neglected to do so, absolutely void, or will a conveyance made by them in the

due course of business, for value, and without fraud, pass to their grantee the title of the property conveyed?

It is clear that by the common law, and also by an express provision of the statute, the estate of trustees is held in joint tenancy, and hence upon the death of one of several trustees nothing passes to his heir or personal representatives, but the whole estate devolves upon the survivors. It is evident, then, that upon the death of Manly the entire legal interest in the property passed to Campbell and Ridgely, the survivors, and no reason is perceived why this interest or title would not pass by their conveyance. Had Manly been living at the time of this conveyance, of course nothing would have passed by it, for the reason, as just shown, that the title to trust property can only be conveyed by the act of all the trustees having an interest in it. Such interest is an entirety, and can only pass as a whole, hence all the trustees living who have accepted the trust must join in the conveyance, otherwise it will be wholly inoperative. In the case before us the entire interest was represented by the surviving trustees who executed the conveyance, and consequently the title to the property passed to their grantees. Nor will the fact that the surviving trustees, in cases of this kind, are required to fill, from time to time, as they shall occur, any vacancies in their number, make any difference in this respect. Notwithstanding such requirement, the conveyance of the survivors will be valid. It is only when the terms of the power creating the trust imperatively require the vacancy to be filled, that the acts of the survivors will be held invalid. Hill on Trustees, side page, 187.

Holding, then, as we do, that the one undivided third of so much of the block of ground in controversy as lies in section 21, passed by the deed of Campbell and Ridgely to Miller and Kent, from whom the defendant in error deduces title in himself, by two separate deeds legally sufficient to pass the title, it is unnecessary to consider the remaining ques-

tions discussed by counsel relating to the appointment of another trustee, and the subsequent conveyances growing out of such appointment.

It is finally urged, with great apparent confidence, that by reason of a certain decree of the circuit court of the United States, rendered at Springfield on the 18th of June, 1866, to which Campbell and Ridgely were parties, directing them to pay over to the master in chancery of that court all the assets of the bank then in their hands, less certain amounts which they were authorized to retain for particular purposes therein specified, Campbell and Ridgely were thereby relieved of their trust, and from thenceforward ceased to be trustees of the bank. The object of the bill in that case was not to remove them as trustees or to relieve them of their trust, but simply to reach the assets in their hands for the payment of the debts of the bank. It is not claimed or pretended this particular piece of land was involved in that suit, or that any order was made by the court with reference to it, and consequently the title in the trustees was unaffected by those proceedings. To the suggestion that the bank having ceased to exist by limitation of its charter, and all its real estate undisposed of reverted to its grantor, without stopping to inquire whether the principle in question has any application to a case like this, where a corporation's real estate, standing in the name of trustees, has, after such supposed dissolution, been sold for a valuable consideration to an innocent purchaser, it is sufficient to say, when the grantors of the bank or their representatives interpose a claim to this property on account of the supposed reverter, it will be time enough to consider this question. Certainly, as between the parties now before the court, there is no merit in the claim.

Upon the whole we think the decree of the court below is right, that none of the objections urged against it are well founded, and that it should therefore be affirmed.

*Decree affirmed.*