THE FIRST NATIONAL BANK OF CHICAGO, Trustee, Plaintiff and Counterdefendant-Appellee, *v.* JOHN R. EDGEWORTH *et al.*, Defendants-Appellants.—(DAVID B. EDGEWORTH *et al.*, Defendants-Appellees; PATRICIA E. LETSINGER *et al.*, Counterclaimants and Third-Party Plaintiffs-Appellees; THE FIRST NATIONAL BANK OF CHICAGO, Trustee, *et al.*, Counterdefendants-Appellees; NANCY EDGEWORTH BARR, Trustee, Third-Party Defendant-Appellee; JOHN R. EDGEWORTH, Trustee, *et al.*, Third-Party Defendants-Appellants; THE FIRST NATIONAL BANK OF CHICAGO, Third-Party Defendant-Appellee; MYRON EDGEWORTH, JR., *et al.*, Counterclaimants and Third-Party Plaintiffs-Appellees; JOHN R. EDGEWORTH, Counterdefendant-Appellant.)

First District (1st Division)    No. 79-2060

Opinion filed March 16, 1981.—Rehearing denied April 27, 1981.

Daniel M. Schuyler and Edgar D. Ballard, Jr., both of Chicago (Schuyler, Ballard & Cowen, of counsel), for appellants.

Loren E. Juhl and Henry L. Mason, III, both of Chicago (Sidley & Austin, of counsel), for appellant The First National Bank of Chicago.

Roy S. Kullby and John J. Jacobsen, Jr., both of Chicago (Vedder, Price, Kaufman & Kammholz, of counsel), for appellee Patricia E. Letsinger.

Rufus D. Beach and John M. Galvin, both of Chicago (Ashcraft & Bridewell, of counsel), for appellees Michael J. Edgeworth and Nancy Edgeworth Barr.

William V. Johnson, of Chicago (Johnson, Cusack & Bell, Ltd., of counsel), for appellees Myron Edgeworth, Jr., and Harriet Anne Edgeworth.

Robert D. Boyle and Mark R. Valley, both of Chicago (Tully, Roddy, Weinstein & Boyle, of counsel), guardian ad litem.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

This complicated appeal involving the sale of corporate stock by a testamentary trust has been made more difficult by the voluminous

record and the lengthy briefs. The action was initiated by the First National Bank of Chicago, a trustee (Bank), by filing a complaint for instructions. The principal contesting parties are beneficiaries of the trust and descendants of the original settlor, Michael J. Edgeworth, who died in 1933. One branch of the Edgeworth family and Victor Oolitic Stone Company, a corporation (Oolitic), will be referred to as "defendants." Another branch of family beneficiaries, including Patricia E. Letsinger, a granddaughter of the settlor, will be referred to as "counterclaimants." They filed a counterclaim seeking to set aside the sale by the trust to Oolitic of stock in Victor Buff Stone Company (Buff).

On June 2, 1978, the trial court entered summary judgment in favor of the Letsinger branch for rescission of the sale. The trial court acted upon the theory that the transaction was consummated by two trustees: the Bank and Nancy Edgeworth Barr, a granddaughter of the settlor, now deceased; whereas the trust instrument required concurrence of three trustees in the transfer of trust property. After additional lengthy hearings, the trial court, on August 17, 1979, entered a judgment entitled "Corrected Final Decree of Rescission and Award of Attorneys Fees" requiring various arrangements and transfers to be made to place the trust in status quo. This judgment also allowed various fees to counsel and surcharged the Bank and John R. Edgeworth equally for payment thereof. The defendants have appealed. The Bank has filed a separate appeal.

A factual statement is essential.

### The Property Involved

The three corporations involved in this litigation are Victor Buff Stone Company, Victor Oolitic Stone Company, and Indian Creek Land Company. These companies own Indiana land which is in close proximity in some areas. Buff and Indian Creek are simply landowners. Oolitic is engaged in the actual quarrying and marketing of limestone products from the Buff property. Indian Creek has never been quarried because its limestone is too far beneath the surface for economic removal.

Buff has always leased its land to Oolitic. Long-term leases were executed because many years of preparation are necessary to develop the land and remove or strip the earth covering the limestone. In addition, a substantial investment on behalf of the operating company is required. The leasing arrangement began prior to 1926. The 1926 lease was to extend for 25 years, but that lease was replaced in 1927 by a lease for a 10-year term. In 1936 the companies entered into a new lease which would run for 20 years, including two 5-year options granted to Oolitic. The 1936 lease was amended in 1948 to extend to January 1, 1968. It was later extended to December 31, 1977.

## The Trust Instrument

The settlor created the trust "for the benefit of his wife and issue." He named his three children—John, Sr., Harriette, and Myron, Sr.,—as individual trustees. The Bank was named as corporate trustee, with provisions for successor trustees in event of death, resignation, or disability. The trust instrument named the settlor's wife, their children, and all issue as income beneficiaries. The trust was to continue for 21 years after the death of the last survivor of the settlor, his wife and children, and six designated grandchildren.

The corpus consisted of the settlor's shareholdings in the three limestone companies "which have come under the control of the grantor over a period of many years." The trust res contained 77.66 percent of the outstanding stock of Buff, 22.14 percent of the outstanding stock of Oolitic, and 71.40 percent of the outstanding stock of Indian Creek. The trust instrument expressed the settlor's desire that "the properties [be] retained as a unit [rather] than * * * sold and the proceeds invested in other securities." The instrument stated, "it is the grantor's opinion that the said lands will have a constantly increasing value * * *," but because of unforeseen, changing conditions, disposition could be "advisable."

## The Family and the Corporations

The record reflects a history of complex family involvement in all three corporations. Around 1900, the settlor was the majority shareholder of Oolitic and in 1924 he became its president. He acquired control of Buff and became a director and its president. In 1928 his son John, Sr., succeeded him as president of Oolitic. In 1932 the settlor and his sons formed Indian Creek and became its directors. The settlor transferred a large number of shares in Oolitic to his two sons. Both sons owned stock in Buff.

The trust instrument was executed on June 3, 1932. The settlor died in 1933. The instrument took effect with John, Sr., Harriette, and Myron, Sr., as the individual trustees and the Bank as the corporate trustee. In 1941 Myron, Sr., died. His wife succeeded him as trustee until 1960 when their daughter Nancy E. Barr succeeded her as trustee. Myron, Sr., had two other children, Myron, Jr., and Michael. John, Sr., Harriette, and Nancy continued as the individual trustees until 1967 when John, Sr., appointed his son John R. Edgeworth to serve as trustee in his place. The trust instrument provided for appointment of successors to individual trustees by deed.

By 1967, John, Sr., had acquired a controlling interest in Oolitic. John, Sr., had two other children, Terrence Edgeworth and Patricia E. Letsinger. John R., Harriette, and Nancy served as the individual trustees until 1971 when Harriette died without issue. The trust agreement

provided that when one of the original trustees died without issue, no one could be appointed to succeed that trustee and only two individual trustees, and also the corporate trustee, were thereafter needed. John R. and Nancy then served as the individual trustees.

On May 29, 1972, John, Sr., died. Pursuant to the trust agreement, an original trustee could also appoint a successor trustee by will or deed to serve after the death of the original trustee. John, Sr., made no testamentary or other provision either for John R. to continue as trustee or for another trustee to be appointed. Thus, John R.'s trusteeship automatically expired on the date of his father's death. This left the trust with only one individual trustee, Nancy. However, the parties themselves, including John R., were unaware that his trusteeship had expired.

### The Sale of Buff Stock

The possible exchange or sale of the trust's Buff stock to Oolitic was discussed as early as 1944. About 1960, the discussions not only continued but also became more frequent. At that time John, Sr., was still a trustee and wished to buy the trust's Buff stock from the trust for Oolitic. He made several unsuccessful attempts to purchase the stock.

The record reflects several plausible reasons which might logically impel the trustees to sell the stock. The limestone industry was characterized as having reached a tapering-off point. In 1960, the Bank favored the sale of the trust assets and stated the settlor's hopes for the land "had failed to materialize to any substantial degree." The Bank did not foresee improvement which would justify retention of the securities. Furthermore, the three children of Myron, Sr., had been making demands for more income. The demands were not satisfied because the trust res consisted of only the stock of the family corporations and it had no other assets such as readily marketable securities or available cash.

In 1972, the shareholders of Buff included the trust (owning 77 percent), Annette Edgeworth, Terrence, John R., and Patricia. John R. was the vice president. The directors included Nancy, who was then a trustee, and also John R. The shareholders of Oolitic were Annette Edgeworth, the trust (owning 22 percent), Terrence (owning 33.35 percent), John R. (owning 32.55 percent), Patricia, and others. John R. was the president and Terrence was vice president. Directors included various family members. The shareholders of Indian Creek were the trust (owning 71 percent), Michael Edgeworth, Terrence, John R., and Oolitic (owning 28.52 percent). John R. was an officer and various family members were on the board of directors.

These discussions culminated in the sale of 1738 shares of Buff stock from the trust to Oolitic for $298,838.55. This took place at a composite meeting of shareholders and directors for the three corporations and the

trustees held on July 26, 1972, two weeks after John, Sr., had died. Among those attending the meeting were Nancy, John R., David T. Vass (on behalf of the Bank), Myron, Jr., D. F. Parrish (secretary of Buff), and Robert Joynt (Bank trust administration officer). John R. presented the offer of purchase in behalf of Oolitic. The minutes of the meeting reflect a "unanimous" decision to sell the Buff stock for this consideration equivalent to $171.95 per share.

Robert Joynt described the transaction more fully in his deposition:

"John * * * asked that while the discussion was entertained by the trustees relative to the price of the stock he leave the room, which he did. [I]t was unanimously agreed that if John Edgeworth would submit a revised purchase intent at a per acre figure of $300 which would be a per share figure of $171.95 that the directors and trustees would consider this as a good offer and would accept it therewith.

John Edgeworth came back into the room * * * and indicated he would be willing to pay $300. * * *. John R. Edgeworth * * * was out of the room [and] did not vote * * *."

### Subsequent Events

Patricia E. Letsinger allegedly learned of the sale in February 1973. On May 15, 1973, Terrence was elected president of Buff and John R. vice president. In June 1973, Patricia demanded the sale be rescinded. On November 14, 1973, Terrence and John voted themselves salaries of $200 per month as officers of Buff. On December 20, 1973, the lease from Buff to Oolitic was extended for an additional 20 years from January 1, 1978, to January 1, 1998. The 20-year term of the existing lease expired in 1978.

On May 31, 1974, the Bank filed a complaint requesting the court to decide whether the trusteeship of John R. continued after his father's death and whether the trust instrument requires three trustees to execute the trust. The complaint prayed appointment of a third trustee if required.

On September 10, 1974, Patricia filed a counterclaim and third-party complaint. Count I alleged John R. was not a trustee after his father's death and, because no third trustee was appointed, the operation of the trust by Nancy and the Bank constituted a breach of trust. John R. acted in dual capacities in negotiating the sale, thereby breaching his duty of loyalty. After termination of his trusteeship, other co-trustees continued to deal with John R. as a trustee. The sale was "consummated solely by action of said Bank" in breach of trust provisions requiring three trustees, and only one trustee signed the stock purchase agreement on behalf of the trust.

Count II alleged the value of the Buff stock at the time of the sale was

substantially in excess of the amount it sold for. By selling at that price, Nancy and the Bank breached the trust and thus damaged the corpus and income.

Count III alleged John R., even after the sale, acted as a trustee and also as a representative of Oolitic. The sale of the Buff stock to Oolitic was self-dealing by John R. as a trustee and a breach of his duty of loyalty and breach of the trust.

On January 7, 1976, Patricia moved for summary judgment. She alleged John R.'s trusteeship terminated at the death of his father, but all believed he was a trustee and he continued to act as a trustee. She alleged two alternative conclusions of law. One was if John R.'s trusteeship terminated on the death of his father, two trustees had no authority and the sale was void. The second was if John R.'s trusteeship survived the death of John, Sr., the sale was void because of self-dealing.

## I
### *The Legal Propriety*
### *of the*
### *Summary Judgment for Rescission*

We find a basic conflict of theories in each of the voluminous briefs filed by the principal parties. The defendants argue at length that the summary judgment was erroneous because the Bank and Nancy Edgeworth Barr, being then the only two trustees, had complete authority to act in connection with sale of the stock. Defendants then contend John R. Edgeworth was at all pertinent times a de facto trustee so that there were three trustees and the sale of the stock was valid.

With equal inconsistency the counterclaimants argue the summary judgment was proper because the trust instrument imperatively required three trustees for the transaction of business and in fact there were only two. In the next breath counterclaimants contend John R. was a de facto and acting trustee so that there were at all times three trustees who had complete power to act.

These inconsistencies can never be reconciled. This is not a situation in which we have alternative pleadings. We are presented with contentions which cannot be made alternatively because they are mutually exclusive. Consequently, we will limit our discussion to the legal propriety of the summary judgment for rescission. First and foremost, the sale of this corporate stock was consummated pursuant to a written contract. (See Ill. Rev. Stat. 1979, ch. 26, par. 2—201.) The Bank was the only trustee which signed the contract dated October 5, 1972. Nancy Edgeworth Barr, who was then a trustee, did not sign the contract. As shown, John R. Edgeworth was not a trustee. He did not sign the contract as a trustee.

Consequently, the simple issue which should have been brought

before the trial court on the matter of rescission of the transaction was whether the signature of one trustee was sufficient to bind the trust. In our opinion, the road to rescission was open and direct. It should have been readily followed. There was no need for the parties to inject additional and extraneous problems into the record.

■■■ Defendants urge summary judgment is "particularly inappropriate where the determination of a party's intent is involved." We are in accord with the contention made by the counterclaimants. The ascertainment of the intent of the settlor is simply a matter of construction of the trust document. Our examination of this instrument convinces us that it presents no ambiguity. It is the settled law of Illinois that where a document is unambiguous ascertainment of its meaning or intent is strictly a matter of law for initial determination by the trial court. (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 744, 365 N.E.2d 1028, and cases there cited.) "Under Illinois law, intent is to be ascertained, if possible, from the language of the instrument itself." (*Ford v. Newman* (1979), 77 Ill. 2d 335, 338-39, 396 N.E.2d 539; see *Stuart v. Continental Illinois National Bank and Trust Co.* (1977), 68 Ill. 2d 502, 528, 369 N.E.2d 1262, *cert. denied* (1979), 444 U.S. 844, 62 L. Ed. 2d 56, 100 S. Ct. 86.) Parol evidence was neither necessary nor proper for the trial court to determine the meaning of the trust instrument. Consequently, there was "no genuine issue as to any material fact" and summary judgment was a proper method to be applied. Ill. Rev. Stat. 1979, ch. 110, par. 57(3).

The following language of article X of the trust agreement is decisive here:

"If any individual Trustee hereinabove named shall die leaving lawful issue him or her surviving and fails to appoint a successor Trustee, and in any other case of a vacancy in an office of the Trustee of this Trust, the remaining Trustee or Trustees then acting shall, in writing, designate a successor Trustee; provided, however, that if any individual Trustee hereinabove named shall die without leaving lawful issue him or her surviving, it shall not be necessary to designate a successor Trustee if there remain three (3) Trustees of this Trust then acting, it being the intention of the Grantor that there should be at all times at least three (3) qualified and acting Trustees."

In this regard defendants rely strongly upon *Golder v. Bressler* (1883), 105 Ill. 419, as setting out the principle of law applicable when the instant trust was created. In *Golder*, the court considered under what circumstances two trustees could convey real estate when the third trusteeship was vacant. The court held (105 Ill. 419, 434):

"It is only when the terms of the power creating the trust imperatively require the vacancy to be filled, that the acts of the survivors will be held invalid."

■■ In our opinion, the trust agreement in the instant case comes squarely within this principle. The entire clause of the instant trust above quoted clearly expressed the intent of the settlor that the trust document "imperatively require[s]" three trustees should act at all times. This clause shows that if one of the children who was a trustee should die without issue, a successor would not be required as long as there were "at all times" a full complement of three qualified trustees. In addition, we glean from the entire remainder of the trust instrument that the settlor wished to perpetuate representation of his entire family by at least three trustees.

The remaining case cited by defendants is *Home For Destitute Crippled Children v. Boomer* (1941), 308 Ill. App. 170, 31 N.E.2d 812, *appeal denied*. That authority is not pertinent here. The trust instrument there required that in event of a vacancy, "the remaining trustee or trustees may from time-to-time" appoint a successor. The use of the word "may" is sufficient to differentiate the case. It has been held that "[g]enerally, the use of the word 'shall' is regarded as indicative of a mandatory intent." *People v. Youngbey* (1980), 82 Ill. 2d 556, 562, 413 N.E.2d 416, citing *Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21, 373 N.E.2d 1332.

We conclude the judgment order entered by the trial judge on June 2, 1978, which rescinded the sale of the stock by the trust to Oolitic, was legal and proper in all respects. It is affirmed.

## II
### The Surcharge Issue

The balance of the summary judgment order of June 2, 1978, simply set the cause for further hearing "to consider the implementation of this decree of rescission * * * and for hearings upon the prayers of the parties with respect to whether and which parties may be surcharged and held liable, if at all, * * *" for costs and attorneys' fees and also for the appointment of a successor trustee.

Counsel for both sides proceeded before the trial court with a series of lengthy hearings allegedly involving issues stemming from the rescission. But in our opinion, a great part of these hearings was superfluous and led to the injection of immaterial matters into this record such as whether John R. Edgeworth was or was not a de facto trustee.

In this regard it is to be noted that the judgment order of August 17, 1979, contains no findings of fact regarding the legal status of John R. Edgeworth as a de jure or de facto trustee. However, in two places in this

judgment order, tendered to the court by counsel for the counterclaimants, John R. is referred to as a de facto trustee. This in turn led to arguments in the briefs regarding the status of John R. and whether or not he was a de facto trustee. In view of the lack of factual testimony on this point, we find it impossible as well as unnecessary to make that determination.

There is another basic inconsistency reflected by the post-judgment proceedings. The judgment for rescission recites, "[F]rom and after the death of John Edgeworth [father of John R. Edgeworth] on May 29, 1972, only two trustees of the Edgeworth Trust existed, namely The First National Bank of Chicago and Nancy Barr * * *." John R. could not simultaneously be a trustee and a nontrustee. Manifestly, he was either one or the other. The summary judgment order of rescission terminated the matter by requiring a rescission for lack of an additional trustee.

■■ The issue of a surcharge of fees and costs against the Bank and John R. is an important matter here. Proceeding in logical order, we conclude that since John R. was not a trustee he was not and could not have been involved in self-dealing. He himself did not buy the Buff stock. The trial court directed rescission only on the basis of lack of a third trustee and not upon self-dealing. Rescission on the basis of lack of legal power to effect the sale is necessarily based upon the premise that John R. was not a trustee and did not act as such. In addition, as his counsel point out, there were no hearings on the factual issue as to whether he acted in good faith and whether the price of the stock was fair. Thus, we do not reach and need not consider the element of self-dealing as a possible basis for surcharge against John R. Edgeworth.

■■ Similarly, since the Bank did not acquire any of the Buff stock, in an individual capacity, it was not guilty of self-dealing. We reject the argument of the counterclaimants that a breach by the Bank has forced "the burden of litigation upon the beneficiaries in order to obtain recoupment of trust property * * *." On the contrary, this record convinces us that the Bank properly protected the trust assets by filing the initial suit here for instructions regarding the legal power of the trustees. We find no bad faith by the Bank to justify a surcharge against it.

It is theoretically correct that a trustee may be personally liable for fees and expenses which must be paid as a result of negligence or mere oversight. (See *Stuart*, 68 Ill. 2d 502, 526.) Counsel for the Bank directs our attention to the strong exculpatory clause in the trust document which provides that the trustees are not answerable for any action "except such acts done or omissions committed in bad faith * * *." We must assume that the settlor included the exculpatory clause advisedly. The courts of Illinois have not hesitated to enforce exculpatory clauses in contracts although the legislature has taken statutory action to prevent the use of certain exculpatory clauses in leases. (See *Kubisen v. Chicago Health*

*Clubs* (1979), 69 Ill. App. 3d 463, 467, 388 N.E.2d 44, citing Ill. Rev. Stat. 1977, ch. 80, par. 91.) A recent decision concerning the use of the exculpatory clause is *Schlessman v. Henson* (1980), 83 Ill. 2d 82, 413 N.E.2d 1252.

In addition, we should consider the practical financial factors operating here. The record shows that from commencement of the sale process until July 1, 1978, the Bank earned more than $110,000 from proceeds of the sale of stock which were slightly under $300,000. Thus, reasonable expenses and attorneys' fees are readily payable from this augmentation of the trust assets. We conclude there should be no surcharge of fees and costs against the Bank or John R. in these proceedings.

Defendants urge there was no culpable self-dealing because the settlor by the very terms of the trust instrument created a pervasive conflict of interest in virtually any dealings with the trust property. Defendants cite, and counterclaimants seek to differentiate, the following authorities: *Tankersley v. Albright* (N.D. Ill. 1974), 374 F. Supp. 538, *aff'd in part, rev'd in part* (7th Cir. 1975), 514 F.2d 956; *Clayton v. James B. Clow & Sons* (N.D. Ill. 1962), 212 F. Supp. 482, *aff'd* (7th Cir. 1964), 327 F.2d 382; and *In re Flagg's Estate* (1950), 365 Pa. 82, 73 A.2d 411. Our careful consideration of these cases impels us to comment that there is a considerable degree of logic in the position thus taken by defendants. However, we do not reach this issue for decision. As above shown, reasoning from the summary judgment as a major premise, we conclude it is totally unnecessary for us to consider this aspect of the issue of self-dealing.

### III
#### *Implementation of the Rescission*

The final judgment of August 17, 1979, incorporated by reference all of "The Findings of Fact and Conclusions of Law" contained in the summary judgment. The final judgment order contained directives in paragraphs A to K. The following is our disposition of these directions:

### A

Oolitic is directed to tender to the trustees certificates for 1738 shares of Buff common stock with proper endorsements and including stock dividends, if any, received since October 1, 1972. This order is affirmed.

### B

The trustees are directed to tender the net sale proceeds ($257,142.54 after taxes) to Oolitic in exchange for the stock certificates. This order is affirmed.

## C

The defendants John R. and Terrence D. Edgeworth are directed immediately to tender their resignations as directors and officers of Buff. In our opinion, this direction is superfluous. It involves simply the corporate management of Buff. It is to be assumed that upon return of the Buff stock to the trust there will of necessity be a meeting of the shareholders for the election of directors. Accordingly, this paragraph is reversed as unnecessary.

## D

The trustees are ordered to pursue refund of Federal and State capital gains taxes resulting from sale of the stock. They are directed to deliver to Oolitic any net proceeds thereof less expenses. This paragraph is affirmed.

## E

As regards the lease from Buff to Oolitic executed on December 20, 1973, we approve this direction for the renegotiation of a new lease between these corporations or between Buff and any other person or corporation which it may desire. We also approve the provision for payment of the reasonable value of the limestone actually removed from Buff's property by Oolitic between January 1, 1978, and the date of termination of the lease extension hereunder. This will permit the newly elected officers of Buff to work out a fair arrangement for the benefit of all concerned. This paragraph is affirmed.

## F

The trustees are directed to obtain reregistration of the Buff shares in the name of the trust and to elect directors and officers for Buff. This paragraph may be surplusage, but it is affirmed.

## G

This paragraph directed the trustees to continue to invest and reinvest the amounts held in the trust. The Bank is to receive ordinary trustees' fees of $17,274.58 through October 24, 1978, and continuation of such payments to the Bank for its ordinary services. This provision is affirmed.

## H and I

The provisions in these paragraphs for payment to Robert D. Boyle of fees and expenses for his services as guardian ad litem and payment of fees and expenses to other attorneys herein are reversed. These provisions are supplanted by a schedule for fees and expenses hereinafter stated.

J

The provisions for surcharge against the Bank and John R. Edgeworth are reversed as shown above.

The allowance of attorneys' fees has been the subject of many decided cases in Illinois. The following is a statement of pertinent principles which have been worked out by our courts:

"The determination of the need for attorneys' fees and the amount of such fees is a decision which rests in the discretion of the trial court." (*Stuart*, 68 Ill. 2d 502, 539.) As a general matter, fees should be allowed in trust cases where "there is an honest difference of opinion as to the meaning of the maker's language in the instrument." *Wool v. La Salle National Bank* (1980), 89 Ill. App. 3d 560, 563, 411 N.E.2d 1135; *Stuart*, 68 Ill. 2d 502, 539.

■■ In addition, "expenses incident to the preservation of a trust or for the benefit thereof are properly chargeable against and reimbursable from the trust estate." (*Wool*, 89 Ill. App. 3d 560, 564.) A reviewing court will not hesitate to reduce attorneys' fees as awarded if they are unreasonably high. (*Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 602, 400 N.E.2d 56.) An attorney recovering under quantum meruit is entitled to receive the reasonable value of his services as shown by the evidence. See *Greenbaum & Browne, Ltd. v. Braun* (1980), 88 Ill. App. 3d 210, 213, 410 N.E.2d 303; see also *Donnelley*, 80 Ill. App. 3d 597, 602.

The matter of fixing attorneys' fees is one of the few areas in which a judge may rely upon the record before him and also upon his own knowledge and experience. (*Van Fleet v. Van Fleet* (1977), 50 Ill. App. 3d 172, 175, 365 N.E.2d 1143, citing *Welsh v. Welsh* (1976), 38 Ill. App. 3d 35, 39-40, 347 N.E.2d 512; see *In re Application of County Collector* (1977), 49 Ill. App. 3d 1048, 1056, 365 N.E.2d 697, *appeal denied* (1977), 66 Ill. 2d 630; see also *Carvallo v. Carvallo* (1978), 62 Ill. App. 3d 394, 400, 378 N.E.2d 1288.) In addition, it seems to us that there should be some reasonable connection between the total amount of fees allowed for legal services rendered and the total amount of the fund involved in the litigation. For example, in *Hoffman v. Lehnhausen* (1971), 48 Ill. 2d 323, 269 N.E.2d 465, the supreme court denied an allowance of fees for attorneys in a class suit involving the Homestead Tax Exemption. The court pointed out that no fund had been brought into court as a result of the litigation. *Hoffman*, 48 Ill. 2d 323, 329.

In the instant case counsel for the counterclaimants have made a lengthy and learned attempt in their brief to convince us that huge sums are involved in this proceeding because the "land is unique and its future value never specifically determined." We reject this argument. We are not concerned here with the entire value of the trust estate and the three corporations involved. The total amount involved in the rescission is

approximately $300,000. The Bank has alleged that an appraisal obtained by Patricia E. Letsinger reflects a difference of "approximately $125,000" between the estimated value of the Buff stock and the selling price thereof. In addition, there are approximately 14 beneficiaries vitally interested in the administration of this trust. In several instances certain beneficiaries appeared to have had a special need for funds. Consequently, we feel the limited amount here involved should be considered in fixing compensation for the attorneys.

We are fully aware of the importance of the payment of fees to attorneys for the valuable services which they perform. All of us know from experience that fees for legal services are in truth the life blood of the practice of law. We are impelled to make certain that such legal fees as are allowed will reflect proper compensation to the attorneys for their services and yet will not be oppressively large.

■■ We cannot agree with the schedule of attorneys' fees fixed by the trial judge. Each and all of these allowances for fees and expenses are accordingly reversed. In fixing a new schedule of fees, which we sincerely hope will be accepted by all parties in interest in a spirit of fairness to all concerned, we have relied upon the legal principles above set forth and also upon the following factors:

The motion for summary judgment above described was filed by the firm of Vedder, Price, Kaufman & Kammholz, attorneys for the counterclaimants. The motion extends from record page 178 to page 368. As above indicated, this motion was proper in the interests of the trust estate and therefore these attorneys should be compensated for their services. But this motion went far beyond the need to show the propriety of rescission based upon lack of one or two trustees.

On October 26, 1978, these attorneys filed a sworn and itemized statement of services rendered by partners (901.1 hours); by associates (618.3 hours); and by paralegals (176.8 hours) to a total of 1696.2 hours plus $2314.24 in necessary cash disbursements. They requested average compensation of $52.50 per person-hour or a total of $92,125.32 for fees and disbursements. Their client, Patricia E. Letsinger, has paid them $6000 on account of fees and $2241.25 for disbursements. The trial judge allowed the law firm $81,159. By amendment filed January 12, 1979, this request was modified to reflect a total of 1367.7 hours and fees $81,159.

It appears to us the major portion of the record before us and a great part of these legal services are devoted to issues which, as shown, are entirely foreign to and contradictory in theory to the principle of rescission for lack of qualified trustees. Our experience teaches us that all of these services were not required to achieve the rescission. The amount involved here cannot possibly justify the award allowed. In our opinion, a fair compensation to these attorneys for the able services which they rendered to the trust estate in connection with the rescission for lack of

trustees and the implementation thereof is $30,000. Addition of expenses of $2314.24 makes a total of $32,314.24.

We find other attorneys for various defendants-counterclaimants named on the brief to whom the trial court allowed fees. In our opinion, the services which were rendered by these other attorneys were duplications. Therefore, these services are not compensable by payments from the trust. (See *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 490, 343 N.E.2d 897.) Accordingly, no fees will be allowed to these remaining attorneys. They will be compensated for their expenditures.

As shown above, we have concluded the legal services rendered by the firm of Sidley & Austin as attorneys for the Bank as trustee are not compensable in these proceedings. However, in our opinion these attorneys should be reimbursed for their cash disbursements which they have itemized in the sum of $2063.83. Similarly, we conclude the attorneys for defendant and counterclaimant Nancy Edgeworth Barr, a trustee herein since 1960 and presently deceased, should not receive compensation for legal services rendered. However, her estate should be reimbursed for her necessary disbursements itemized in the sum of $256.84.

Robert D. Boyle appeared as "Guardian Ad Litem for Certain Minor Defendants and Trustee for Persons Not in Being." He should be allowed reasonable fees for services rendered. His itemized statement reflects a total of 214.75 hours which includes some 56 hours of court time. We have concluded the allowance to the Guardian for fees and expenses should be reduced to $2532.50.

The trial judge also allowed defendant and counterclaimant Patricia E. Letsinger $11,866.25 for expenses. This included items such as three trips from her home in Florida to Chicago, including meals, air fare, and hotel fees, together with long distance charges "and incidental expenses." We know of no authority for the allowance of expenses of this type. The record does show that Patricia E. Letsinger paid $3625 for an appraisal of the land owned by Buff. In our opinion, this item was actually expended for the benefit of the trust and beneficiaries, and it should accordingly be allowed. We assume the information reflected therein will be made available by Mrs. Letsinger to the remaining trustees.

Counsel for the defendants, Daniel M. Schuyler and Edgar D. Ballard, Jr., are, in our opinion, entitled to reasonable fees for services rendered. They presented an itemized schedule of legal services rendered by their partners to the extent of some 2000 hours and by associates for 171 hours and also itemized expenditures of $3730 for court reporter charges and travel expense, etc. In the case before us these attorneys rendered valuable services, but not all of their services were directed to the basic issue of rescission of the transaction. These attorneys filed an answer to the motion for summary judgment extending from record page 387 to page 836. However, they should be allowed fees because there was

an honest difference of opinion on the point of construction of the trust instrument. (See *Stuart*, 68 Ill. 2d 502, 539, citing *Orme v. Northern Trust Co.* (1962), 25 Ill. 2d 151, 165, 183 N.E.2d 505, *cert. denied sub nom. Von Hardenberg v. Kennedy* (1962), 371 U.S. 935, 9 L. Ed. 2d 271, 83 S. Ct. 308; *Northern Trust Co. v. Tarre* (1980), 83 Ill. App. 3d 684, 692, 404 N.E.2d 882.) In our opinion, they should be allowed the sum of $10,000 in fees and $3730 in expenses.

Accordingly, this court directs payment by the Bank of the following fees and expenses in lieu of the allowances made in paragraph "I" of the final judgment order:

| | |
|---|---:|
| Vedder, Price, Kaufman & Kammholz | $32,314.24 |
| Patricia E. Letsinger Cost of Appraisal | 3,625.00 |
| Daniel M. Schuyler and Edgar D. Ballard, Jr. | 13,730.00 |
| Robert D. Boyle and Mark R. Valley Guardian Ad Litem and Trustee | 2,532.50 |
| William V. Johnson for Cash Disbursement | 178.08 |
| Sidley & Austin for Cash Disbursements | 2,063.83 |
| Estate of Nancy Edgeworth Barr for Cash Disbursements | 256.84 |

Calculation shows the total amount of the above attorneys' fees and expenditures is approximately $54,000. The schedule originally fixed by the trial judge required payment of approximately $122,000 for fees and expenses. Thus, there has been a reduction of more than 50 percent in the total allowance of fees and costs.

Accordingly, the judgment order for summary judgment entered June 2, 1978, is affirmed. The final judgment order of August 17, 1979 (nunc pro tunc as of August 6, 1979), is affirmed in part, reversed in part, and modified in part.

Judgment orders appealed from affirmed in part, reversed in part, and modified in part.

McGLOON and CAMPBELL, JJ., concur.